**Donald LUSK, Plaintiff–Appellant,**

v.

**VILLAGE OF COLD SPRING,
Defendant–Appellee.**

**Docket No. 05–4999 CV.**

United States Court of Appeals,
Second Circuit.

Argued: March 22, 2006.

Decided: Jan. 31, 2007.

Stephen Bergstein, Thornton, Bergstein & Ullrich, LLP, Chester, NY, for Plaintiff–Appellant.

James A. Randazzo, Servino, Santangelo & Randazzo, LLP, Hawthorne, New York, for Defendant–Appellee.

Before STRAUB and SACK, Circuit Judges, and TRAGER, District Judge.*

SACK, Circuit Judge.

The plaintiff, Donald Lusk, is a resident of the Architectural and Historic District (the "Historic District") of the Village of Cold Spring, New York (the "Village"). In 2004, he posted various signs on his residential property protesting a real estate development on Cold Spring's Hudson River waterfront. The Village served Lusk with a "Violation Notice" charging him with six counts of violating various provisions of the Cold Spring Village Code (the "Code"). Lusk then filed a complaint in the United States District Court for the Southern District of New York under 42 U.S.C. § 1983 in which he alleged that the Code provisions violated the First Amendment to the United States Constitution made applicable to the Village through the Fourteenth Amendment. He sought declaratory and injunctive relief, nominal damages, and attorney's fees.

The district court (Colleen McMahon, *Judge*), in a thoughtful and thorough opinion, granted Lusk's motion to enjoin the Village from enforcing some of the Code's challenged provisions, concluding that they were unconstitutional. *See Lusk v. Vill. of Cold Spring*, 418 F.Supp.2d 314, 321–24 (S.D.N.Y.2005). The court decided, however, that Chapter 64 of the Code, which requires that the Village's Architectural and Historic District Review Board (the "Review Board" or "Board") give prior approval to any physical alterations to residential or commercial buildings within the Historic District, was constitutional both on its face and as applied to Lusk's signs. *Id.* at 324–28. The court reasoned that Chapter 64 was a content-neutral regulation of speech that furthered the substantial government interest in preserving the aesthetic integrity of the Historic District while leaving open to the plaintiff ample alternative channels of communication. It further determined that "Chapter 64 did not confer unfettered discretion on the Review Board" with respect to whether or not to grant approval, concluding that Chapter 64 therefore was not facially unconstitutional. *Id.* at 328. It denied Lusk's motion to enjoin the Village's enforcement of that portion of the Code.

The Village does not cross-appeal to contest the district court's judgment insofar as it struck down as unconstitutional several portions of the Code. The sole issue before us, therefore, is whether the district court erred in concluding that Chapter 64 was constitutional. We conclude that although the standards employed by Chapter 64 are constitutionally permissible, the procedures it employs to effect them are not.

## BACKGROUND

*Lusk's Violations of the Code*

Lusk resides on Main Street in the Historic District. His house is flush against the front sidewalk. There is therefore no front lawn or other space between the house and the sidewalk.

In June 2004, Lusk began placing signs, which appear from pictures of them includ-

---

* The Honorable David G. Trager, of the United States District Court for the Eastern District of New York, sitting by designation.

ed in the record to have been made by applying spray paint to large pieces of plywood, on or leaning against his front porch. The signs conveyed Lusk's protest against a real estate development on the Cold Spring waterfront, with messages such as, "Go to public hearing to see plans for our waterfront"; "Think that building is big"; "Why does local government change[ ] zoning laws[ ] for-condos"; and "Help save the waterfront from 40'-foot high monster condos."[1] On July 19, 2004, the Building Inspector for the Village of Cold Spring served Lusk with a Violation Notice for having displayed two of the signs without requisite prior approval. It charged Lusk with several violations of the Code:

(1) Two counts of violating Code § 64–5(A), which provides that "[i]t shall be unlawful for any owner or person occupying property located within the [Historic] District to [m]ake, permit or maintain any alteration to any improvement located within the District unless the Historic District Review Board has previously issued a Certificate of Economic Hardship or a Certificate of Appropriateness."

(2) Two counts of violating Code § 134–9(B), which prohibits the posting of signs without a site-plan review by the Village Planning Board.

(3) Two counts of violating Code § 134–9(G)(1), which provides that "signs are a permitted accessory to an establishment on the same lot." The Notice alleged that Lusk was in violation of section 134–9(G)(1)(b) because the signs did not qualify as an "accessory" and because the aggregate size of his signs exceeded thirty-two square feet.

On August 2, 2004, the Building Inspector issued a ticket to Lusk requiring him to appear at the Village of Cold Spring Justice Court on August 9, 2004, in order to respond to the alleged violations of the Code.[2] On November 1, 2004, prior to a disposition in the criminal proceedings against him, Lusk filed a complaint in the United States District Court for the Southern District of New York pursuant to 42 U.S.C. §§ 1983 and 1988, in which he sought various forms of declaratory and injunctive relief, nominal damages and attorney's fees. He alleged that the provisions of the Code he was charged with violating infringed his rights under the First Amendment to the United States Constitution, which are applicable to the Village through the Fourteenth Amendment. He also asserted that Chapter 104 of the Code, which regulates the posting of signs in such public places as utility poles, public streets, and public sidewalks, as applied to his signs, violated the First Amendment.[3]

The district court, abstaining from interference with Lusk's ongoing criminal proceedings, see Lusk, 418 F.Supp.2d at 318, set a briefing schedule. On January 10, 2005, Lusk pled guilty in Village Justice

---

**1.** While it is not within this Court's competence to offer either architectural or artistic criticism, see Tunick v. Safir, 209 F.3d 67, 91 n. 1 (2d Cir.2000) (Sack, J., concurring in judgment) ("The First Amendment does not protect expression based on an appraisal of its worth by any government official, including the author of this opinion."), we would venture to guess that the average person would think the signs, pictures of which are in the record, to be unusually large, crudely made, and unsightly.

**2.** It is not clear from the record whether any such hearing occurred and, if so, whether Lusk appeared at it.

**3.** Although Lusk was not charged with violating this provision, he asserted that he intended to post signs in support of his future candidacy for mayor and therefore had standing to challenge it.

Court to one count of posting signs without a permit, a violation of Chapter 134–9B.

*The District Court Opinion*

The district court first consolidated Lusk's request for a preliminary injunction with his request for a permanent injunction. *Lusk*, 418 F.Supp.2d at 317–18. The Village conceded that Chapter 104 was unconstitutional. The court therefore granted Lusk's motion to enjoin its enforcement. *Id.* at 321.

The court also granted Lusk's motion to enjoin the enforcement of Chapter 134. *Id.* at 321–24. That provision defines "sign" as "[a]ny device for visual communication that is used for the purpose of bringing the subject thereof to the attention of the public, but not including any flag, badge or insignia of any governmental agency or any civic, charitable, religious, patriotic, fraternal or similar organization." *Id.* at 321. Because this definition of "sign" explicitly excludes from its scope some communications based on their content, and because all of Chapter 134's regulations of signs incorporated that definition, the court concluded that the ordinance was "not content neutral, and for that very reason cannot possibly [have been] the narrowest means to effect [the] compelling governmental interest" in "promoting aesthetics and traffic safety." *Id.* at 324, 323. Employing a strict scrutiny analysis, the court held the entire chapter to be unconstitutional. *Id.* at 324.

The district court concluded, however, that Chapter 64, which purports to regulate the appearance of residential and commercial properties within the Historic District, is constitutional. The court first asked whether Chapter 64 is content neutral, noting that its stated purpose is the "enhancement, perpetuation, preservation and use of improvements of historic, aesthetic, and architectural value" in order to foster "the health, prosperity, safety and welfare of the people of the Village of Cold Spring." *Id.* To this end, the Code requires residents seeking to make or maintain an "alteration to any improvement" in the Historic District first to apply for a "Certificate of Economic Hardship" or a "Certificate of Appropriateness" ("COA") from the Review Board. Code § 64–5(A). The Review Board is required to act on applications within forty-five days of the first formal review by the Review Board. The district court decided that this requirement "applies to all types of alterations and improvements—and hence, to all types of signs." *Id.* at 326. The court thus concluded that the regulation was content neutral, triggering only an "intermediate" level of scrutiny. *Id.*

Under "intermediate scrutiny," a regulation must be "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). Applying intermediate scrutiny, the district court concluded that the ordinance serves a "substantial government interest." *Lusk*, 418 F.Supp.2d at 326 (citing *Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 805, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984)) ("It is well settled that the state may legitimately exercise its police powers to advance esthetic values.")). The court further concluded that the Review Board's approval process for alterations to physical improvements established by the Code is not more burdensome than necessary since "[i]t is possible to imagine that, without these regulations, the historic character of the district would be entirely wiped away." *Id.* at 327 (footnote omitted).

Finally, the court concluded that the regulation leaves open ample alternative

channels of communication: "[I]f I am reading the literal text of Chapter 64 correctly, plaintiff and other residents of the Historic District may even be free to post signs on their property (as long as they did not 'affix' the signs to their 'improvements')." *Id.* The court concluded that even if it is not "the most efficient and effective form of regulation," Chapter 64 is nevertheless constitutionally valid. *Id.*

The district court also addressed Lusk's argument that Chapter 64 gives the Review Board excessive discretion in determining which applications to approve. Chapter 64–7 provides:

Alteration of designated property shall be compatible with its historic character, and with exterior features of neighboring properties. In applying the principle of compatibility, the Review Board shall consider the following factors:

(a) The general design, character and appropriateness to the property of the proposed alteration or new construction;

(b) The scale of proposed alteration or new construction in relation to the property itself, surrounding properties, and the neighborhood;

(c) Texture and materials, and their relation to similar features of the properties in the neighborhood;

(d) Visual compatibility with surrounding properties, including proportion of the property's front facade, proportion and arrangement of windows and other openings within the facade and roof shape; and

(e) The importance of architectural or other features to the historic significance of the property.

Code § 64–7(A)(2). Chapter 64–7 also provides that the Review Board will be "guided by the [United States] Secretary of the Interior's Standards for Rehabilita-

tion and Guidelines for Rehabilitating Historic Properties." Code § 64–7(C).

While acknowledging that the required evaluation is "an inherently subjective enterprise," the district court nevertheless concluded,

These codified constraints on Board conduct require the Board to make and justify its decisions in conformity with a variety of factors, none of which touches on the content of any message to be imparted by the alteration or improvement. Since consideration of content would be constitutionally impermissible, the fact that the ordinance does not contain a specific prohibition against content consideration does not militate against a finding of constitutionality. I conclude that Chapter 64 does not confer unfettered discretion on the Review Board—far from it—and that plaintiff's challenge to the Chapter on this ground fails as well.

*Lusk,* 418 F.Supp.2d at 328.

On appeal, Lusk challenges the district court's ruling with respect to the constitutionality of Chapter 64. As noted, the Village does not appeal the district court's conclusion that Chapters 104 or 134 of the Code are unconstitutional.

## DISCUSSION

I. Standard of Review

Lusk sought both a preliminary and a permanent injunction. We review the grant or denial of a preliminary injunction by a district court for abuse of discretion. *MONY Group, Inc. v. Highfields Capital Mgmt., L.P.,* 368 F.3d 138, 143 (2d Cir. 2004). "Questions of law decided in connection with requests for preliminary injunctions ... receive the same de novo review that is appropriate for issues of law generally." *Am. Express Fin. Advisors*

*Inc. v. Thorley,* 147 F.3d 229, 231 (2d Cir.1998).

To obtain a preliminary injunction a party must demonstrate: (1) that [he or she] will be irreparably harmed if an injunction is not granted, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of the hardships tipping decidedly in its favor.

*Bronx Household of Faith v. Bd. of Educ.,* 331 F.3d 342, 348–49 (2d Cir.2003). "The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success." *Amoco Prod. Co. v. Vill. of Gambell,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987).[4]

II. Application of the First Amendment

The First Amendment provides: "Congress shall make no law ... abridging the freedom of speech...." U.S. Const. amend. I. Although the language speaks in terms of what is forbidden to "Congress," it has, of course, long been established that "the conception of liberty under the due process clause of the Fourteenth Amendment embraces the right of free speech," *Stromberg v. California,* 283 U.S. 359, 368, 51 S.Ct. 532, 75 L.Ed. 1117 (1931), and that its provisions therefore apply to state governments. Because "[i]t is also well settled that municipal ordinances adopted under state authority constitute state action and are within the prohibition of the amendment," *Lovell v. City of Griffin,* 303

U.S. 444, 450, 58 S.Ct. 666, 82 L.Ed. 949 (1938), the First Amendment's protection of free speech applies to the municipal ordinance at issue on this appeal. Title 42, Section 1983 of the United States Code affords Lusk a cause of action against the Village if, as he alleges, it has deprived him of such a constitutional right.

III. Chapter 64 as a Prior Restraint

■ Lusk begins his argument on appeal by contending that Chapter 64 constitutes a "prior restraint" on his expression. Appellant's Br. at 5. The Supreme Court has referred to "[p]rior restraints on speech and publication [as] the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart,* 427 U.S. 539, 559, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). They are subjected to judicial scrutiny "with a 'heavy presumption' against [their] constitutional validity." *Org. for a Better Austin v. Keefe,* 402 U.S. 415, 419, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971) (quoting *Carroll v. Princess Anne,* 393 U.S. 175, 181, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968), and *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963)).

A law requiring prior administrative approval of speech falls within the prior restraint rubric.[5] In *Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), for example, the Supreme Court considered the constitutionality of a state law establishing a Board of Censors to which all films had to be submitted before being shown with in the state. In striking down the law, the Court acknowledged the "heavy presumption" against the "constitutional validity" of such a "sys-

---

4. The district court's consolidation of Lusk's request for a preliminary injunction with his request for a permanent injunction, *see Lusk,* 418 F.Supp.2d at 317–18, was therefore appropriate.

5. The district court referred to Chapter 64 as a prior restraint. *See Lusk,* 418 F.Supp.2d at 328.

tem of prior restraints of expression." *Id.* at 57, 85 S.Ct. 734 (quoting *Bantam Books,* 372 U.S. at 70, 83 S.Ct. 631); *see also Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 150–51, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969) ("[A] law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional."); *Cox v. Louisiana,* 379 U.S. 536, 557, 85 S.Ct. 466, 13 L.Ed.2d 487 (1965) ("It is clearly unconstitutional to enable a public official to determine which expressions of view will be permitted and which will not or to engage in invidious discrimination among persons or groups ... by use of a statute providing a system of broad discretionary licensing power...."); *Staub v. City of Baxley,* 355 U.S. 313, 322, 78 S.Ct. 277, 2 L.Ed.2d 302 (1958) ("[A]n ordinance which, like this one, makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms."); *Kunz v. New York,* 340 U.S. 290, 293, 71 S.Ct. 312, 95 L.Ed. 280 (1951) ("We have here, then, an ordinance which gives an administrative official discretionary power to control in advance the right of citizens to speak on religious matters on the streets of New York. As such, the ordinance is clearly invalid as a prior restraint on the exercise of First Amendment rights."); *Beal v. Stern,* 184 F.3d 117, 124 (2d Cir.1999) ("Because the [New York City] Rules [at issue] condition the exercise of expressive activity on official permission—a Parks Department permit—they do constitute a 'prior restraint' on speech. The essence of prior restraints are that 'they give public officials the power to deny use of a forum in advance of actual expression.' ") (quoting *Se. Promotions, Ltd. v. Conrad,* 420 U.S. 546, 553, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975)).

This aversion to what is in effect the licensing of expression has an ancient pedigree. "[M]uch of the special hostility to traditional prior restraints has concerned the context in which they historically operated: one was prohibited from publishing without the approval of a professional censor who usually operated in secret and with great discretion." Marc A. Franklin *et al., Cases and Materials on Mass Media Law* 95 (7th ed. 2005) ("Franklin *et al.*"). The Supreme Court's seminal decision giving rise to the presumptive invalidity of prior restraints, *Near v. Min. ex. rel. Olson,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931), noted that it was "[t]he struggle in England, directed against the legislative power of the licenser [sic]" that "resulted in renunciation of the censorship of the press." *Id.* at 713, 51 S.Ct. 625. And in *Thomas v. Chicago Park District,* 534 U.S. 316, 320, 122 S.Ct. 775, 151 L.Ed.2d 783 (2002), the Court observed that the First Amendment "prohibits a wide assortment of government restraints upon expression, but the core abuse against which it was directed was the scheme of licensing laws implemented by the monarch and Parliament to contain the 'evils' of the printing press in 16th-and 17[th]-century England."

Insofar as Chapter 64 is a "system of prior restraints," then, it may be said to be "presumptively" unconstitutional. But, even so, the question remains whether the ordinance is "an *invalid* prior restraint." *Thomas,* 534 U.S. at 321, 122 S.Ct. 775 (emphasis added) (concluding that content-neutral and specific licensing regulations with respect to large scale events in municipal parks including those involving the exercise of the right to speak did not con-

stitute "an invalid prior restraint"); *see also Beal,* 184 F.3d at 124 ("The conclusion that a regulation constitutes a prior restraint, however, is not dispositive of its constitutional validity.").[6]

We conclude, however, contrary to the ruling of the district court, that Chapter 64 is constitutionally invalid. It is one of the typical attributes of prior restraints—that Chapter 64 acts to "freeze" the speech of the plaintiff and others like him who reside in the Historic District and who wish to use signs to convey message, "at least for the time" it takes them to obtain a COA, *see Neb. Press Ass'n,* 427 U.S. at 559, 96 S.Ct. 2791—that we find to be at the heart of the ordinance's invalidity.

---

6. "The common law's hostility to prior restraints [based on the English licensing practices] did not necessarily extend to injunctions.... Only later, with the expansion of equity jurisdiction and the emergence of injunctive relief as a common remedy, was the concept of prior restraint applied to judicial prohibitions against publication." Franklin *et al., supra,* at 90. For at least the past half-century, however, the term "prior restraint" has often been associated with court-imposed injunctions on expression, as opposed to legislative licensing schemes such as the one before us here. *See, e.g., Neb. Press Ass'n,* 427 U.S. at 556, 96 S.Ct. 2791; *N.Y. Times Co. v. United States,* 403 U.S. 713, 714, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (the *"Pentagon Papers Case"); Org. for a Better Austin,* 402 U.S. at 419, 91 S.Ct. 1575; *Carroll,* 393 U.S. at 181, 89 S.Ct. 347.

Unlike licensing statutes, an injunction against speech is nearly always unconstitutional. *See, e.g., Pentagon Papers Case,* 403 U.S. at 714, 91 S.Ct. 2140. One reason is that a licensing law such as Chapter 64, if unconstitutional, may be challenged by engaging in the forbidden conduct. An injunction against speech, by contrast, must ordinarily be obeyed on pain of contempt, *see Walker v. City of Birmingham,* 388 U.S. 307, 314, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967), even if it " 'cannot withstand the mildest breeze emanating from the Constitution,' " *United States v. Dickinson,* 465 F.2d 496, 500–01 (5th Cir.1972) (citing *Se. Promotions, Ltd.*

## IV. The Necessity for a License

### A. City of Ladue *and* Watchtower Bible

In *City of Ladue v. Gilleo,* 512 U.S. 43, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994), the Supreme Court addressed circumstances markedly similar to those presented by this appeal. The plaintiff, a resident of Ladue—a suburb of St. Louis, Missouri—had posted on her property in front of her house a sign protesting the first Gulf War. She thereby disobeyed a local ordinance prohibiting signs on residential front lawns, with certain exceptions for, among other things, "residential identification signs no larger than one square foot, ... signs advertising that the property is for

---

*v. City of W. Palm Beach,* 457 F.2d 1016, 1017 (5th Cir.1972) (Irving L. Goldberg, J.) (using the phrase to describe the constitutional propriety of a municipal licensing scheme)); *Chicago Council of Lawyers v. Bauer,* 522 F.2d 242, 248 (7th Cir.1975) (noting that "[n]ormally a 'prior restraint' constitutes a predetermined judicial prohibition restraining specified expression and it cannot be violated even though the judicial action is unconstitutional if opportunities for appeal existed and were ignored") (citing *Walker,* 388 U.S. at 307, 87 S.Ct. 1824). *But see In the Matter of Providence Journal Co.,* 820 F.2d 1354, 1355 (1st Cir.1987) (en banc) (per curiam) (concluding that a publisher may publish despite a "transparently unconstitutional order of prior restraint" against the publication if the publisher first "make[s] a good faith effort to seek emergency relief from the appellate court"), *cert. granted sub nom. United States v. Providence Journal Co.,* 484 U.S. 814, 108 S.Ct. 65, 98 L.Ed.2d 28 (1987), *cert. dismissed on other grounds,* 485 U.S. 693, 108 S.Ct. 1502, 99 L.Ed.2d 785 (1988). Moreover, unlike licensing laws, injunctions are generically suspect because they are typically content based while licensing laws often are not. *See* Franklin *et al., supra,* at 91. Relatedly, injunctions, unlike the denial of a license, may be expected to prohibit all publication of the subject speech, as in the *Pentagon Papers Case,* not only its conveyance in a particular medium, as Chapter 64 did when applied to Mr. Lusk's signs.

sale, lease or exchange and identifying the owner or agent ... [and] signs for churches, religious institutions and schools." *Id.* at 46–47, 114 S.Ct. 2038 (quotation marks, citations and footnote omitted; alterations incorporated).

The Eighth Circuit struck down the ordinance on First Amendment grounds, concluding that its listed exceptions rendered it a content-based regulation of speech that could not pass muster under "strict scrutiny." *Gilleo v. City of Ladue,* 986 F.2d 1180, 1183–84 (8th Cir.1993). "To survive strict scrutiny, content-based restrictions must be necessary to serve a compelling interest and must be narrowly drawn to achieve that end." *Id.* at 1183 (citing *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.,* 502 U.S. 105, 118, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991)).

A unanimous Supreme Court affirmed, but using a different approach. It began by differentiating between "two analytically distinct grounds" for challenging ordinances regulating signs.[7] *City of Ladue,* 512 U.S. at 50, 114 S.Ct. 2038. One "ground" justifies striking down a regulation when it prohibits "too little speech." *Id.* at 51, 114 S.Ct. 2038. The Court noted that, for instance, by carving out exceptions to an otherwise blanket ban on speech, the city had effectively given preference to one type of speech over another. *Id.; see also Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 515, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981) (plurality opinion) (holding unconstitutional a billboard ban in part because of the exceptions to the ban and noting that "[w]ith respect to noncommercial speech, the city may not choose the appropriate subjects for public discourse"). The Court's concern with

such preferences is in part what justifies its application of strict scrutiny to "content-based" regulations. *See, e.g., First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765, 785, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) (applying heightened scrutiny to a Massachusetts campaign financing statute that, in the Court's view, constituted "an attempt to give one side of a debatable public question an advantage in expressing its views to the people").

But the *City of Ladue* Court declined to base its decision on underinclusiveness. It explained that if it were to do so, as the Eighth Circuit had, "the City might theoretically remove the defects in its ordinance by simply repealing all of the exemptions." *City of Ladue,* 512 U.S. at 53, 114 S.Ct. 2038; *see also Metromedia,* 453 U.S. at 540, 101 S.Ct. 2882 (Stevens, J., dissenting in part) (criticizing the plurality for having "focuse[d] its attention on the exceptions from the total ban and [having], somewhat ironically, conclude[d] that the ordinance is an unconstitutional abridgment of speech because it does not abridge enough speech").

The Court examined instead whether the regulation prohibits "too much speech." *City of Ladue,* 512 U.S. at 53, 114 S.Ct. 2038. Under this approach, removing the exceptions does not cure the constitutional defect. The Court said that it would therefore "first ask whether Ladue may properly *prohibit* [the plaintiff] from displaying her [antiwar] sign, and then, only if necessary, consider the separate question whether it was improper for the City simultaneously to *permit* certain other signs." *Id.* (emphasis in original). In so doing, the Court explained, it would assume, for purposes of its analysis, that

---

7. Presumably, the Court did not have in mind ordinances for which vagueness was a problem.

the regulation was content neutral, thereby avoiding strict scrutiny. *Id.* But rather than apply intermediate scrutiny, as generally would be appropriate for a content-neutral regulation, *see, e.g., Perry,* 460 U.S. at 45, 103 S.Ct. 948, the Court considered the ordinance's purpose and its impact upon what it concluded was a unique medium by which Ladue's residents might communicate with one another, *City of Ladue,* 512 U.S. at 54, 114 S.Ct. 2038.[8]

The purported public purpose of the *City of Ladue* ordinance was the "City's interest in minimizing the visual clutter associated with signs." *Id.* at 54, 114 S.Ct. 2038. But the Court noted that in *Linmark Associates, Inc. v. Willingboro,* 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977), it had struck down a city's ban on "for sale" signs for houses on their own property in order to stem "white flight." The City of Ladue's interest was "concededly valid but certainly no more compelling than the interest at stake in *Linmark." City of Ladue,* 512 U.S. at 54, 114 S.Ct. 2038.

The Court concluded that the valid purpose of the city's ordinance did not justify its "almost complete[ ] foreclos[ure of] a venerable means of communication that is both unique and important." *Id.* "Residential signs," the Court explained, "are an unusually cheap and convenient form of communication. Especially for persons of modest means or limited mobility, a yard or window sign may have no practical substitute." *Id.* at 57, 114 S.Ct. 2038. "[A] special respect for individual liberty in the home has long been part of our culture and our law; that principle has special resonance when the government seeks to

constrain a person's ability to *speak* there." *Id.* at 58, 114 S.Ct. 2038 (internal citations omitted) (emphasis in original). Thus, the Court concluded that even had the regulation been content neutral, in light of the unique characteristics of yard signs and their importance as means of communication, it was "not persuaded that adequate substitutes exist[ed] for the important medium of speech that Ladue ha[d] closed off." *Id.* at 56, 114 S.Ct. 2038.

The *City of Ladue* approach was echoed in *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton,* 536 U.S. 150, 122 S.Ct. 2080, 153 L.Ed.2d 205 (2002), in which a congregation of Jehovah's Witnesses challenged a village ordinance under which it was a misdemeanor to engage in door-to-door canvassing without first obtaining a permit from the village mayor. The district court and the Sixth Circuit, applying intermediate scrutiny to what it viewed as a content-neutral regulation, upheld the ordinance. See *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton,* 240 F.3d 553, 564 (6th Cir.2001). The Supreme Court reversed.

The Court surveyed the long history of Jehovah's Witnesses' challenges to speech regulations, noting that such cases "provide both a historical and analytical backdrop." *Watchtower Bible,* 536 U.S. at 161, 122 S.Ct. 2080. It explained that they "emphasize the value of the speech involved" and show that "there must be a balance between [a town's] interests and the effect of the regulation on the First Amendment rights." *Id.* at 163, 122 S.Ct. 2080. Although the parties had "adamantly dispute[d]" the appropriate standard of review, the Court noted that the answer

---

**8.** In her concurrence, Justice O'Connor criticized the Court for ignoring the traditional inquiry. "I would have preferred to apply our normal analytical structure in this case, which may well have required us to examine this law with the scrutiny appropriate to content-based regulations." *City of Ladue,* 512 U.S. at 60, 114 S.Ct. 2038 (O'Connor, J., concurring).

490

could not be found in the previous Jehovah's Witnesses cases. But it concluded that it was "unnecessary ... to resolve that dispute because the breadth of speech affected by the ordinance and the nature of the regulation make it clear" that it must be struck down. *Id.* at 164, 122 S.Ct. 2080.

While recognizing the Village of Stratton's legitimate concern about the prevention of fraud and crime and its legitimate desire to protect its residents' privacy, the Court concluded that those interests did not justify the regulation, which appeared to apply even to "residents casually soliciting the votes of neighbors, or ringing doorbells to enlist support for employing a more efficient garbage collector." *Id.* at 165, 122 S.Ct. 2080 (internal quotation marks and footnote omitted).

Although the Village of Stratton had argued that the registration requirement was purely ministerial and that a request for a permit had never been denied, the Court concluded that "a law requiring a permit to engage in such speech constitutes a dramatic departure from our national heritage and constitutional tradition." *Id.* at 166, 122 S.Ct. 2080. The Court based its conclusion on the facts that: (1) the permit process made it impossible for a person to support a cause anonymously; (2) some people, because of

either their "religious scruples" or their "firm convictions that such speech is constitutionally protected," will refrain from applying for such a license; and (3) the ordinance "effectively banned" spontaneous speech, such as that of the hypothetical person "who made a decision on a holiday or weekend to take an active part in a political campaign" or who made "a spontaneous decision to go across the street and urge a neighbor to vote against the mayor." *Id.* at 167–68, 122 S.Ct. 2080

The *Watchtower Bible* Court concluded that while the "breadth and unprecedented nature of this regulation" did not alone render it invalid, the government's purported interest in preventing fraud could not justify "its application to petitioners, to political campaigns, or to enlisting support for unpopular causes." *Id.* at 168, 122 S.Ct. 2080.

■ Thus, under these relatively recent decisions, because of the "particular concern with laws that foreclose an entire medium of expression," *City of Ladue*, 512 U.S. at 55, 114 S.Ct. 2038, even if it is content neutral, the reviewing court in such cases must balance the state's interest in regulating speech against the individual and public's interest in protecting it.[9] Because the ordinance at issue here, similar to that considered by *City of Ladue*, addresses the "entire medium" of

9. This doctrinal shift has been noted by commentators. Professor Post, for example, identified *City of Ladue* as a "classic illustration" of an ordinance "with a neutral and appropriate justification that completely prohibits an important and distinct medium of expression." Robert Post, *Recuperating First Amendment Doctrine*, 47 Stan. L.Rev. 1249, 1264 (1995) (internal quotation marks omitted). Because such a regulation would have easily passed intermediate scrutiny, Professor Post maintained, the Court was forced to "twist and evade its own recent doctrinal pronouncements" to reach a result consistent with the purposes of the First Amendment.

*Id.; see also* Wilson R. Huhn, *Assessing the Constitutionality of Laws That Are Both Content–Based and Content–Neutral: The Emerging Constitutional Calculus*, 79 Ind. L.J. 801, 854 (2004) (surveying several recent Supreme Court First Amendment cases, including *Watchtower Bible*, and concluding that "whether a law is content-based or content-neutral is increasingly beside the point. Most laws affecting freedom of expression have both content-based and content-neutral elements, and as a result the Supreme Court has begun to replace the categorical approach in freedom of expression cases with a balancing approach.").

"outdoor signs" in the Historic District, Code § 64–2(B), we must apply the *City of Ladue* test.

## B. Analysis of Chapter 64–7 under City of Ladue

█ Among the stated purposes of Chapter 64 is to "[s]afeguard the Village of Cold Spring's historic[,] aesthetic, architectural and cultural heritage." Code § 64–1(B)(2). The Village asserts that the Supreme Court considers preservation of aesthetic values to be a legitimate government interest. *See Members of the City Council v. Taxpayers for Vincent,* 466 U.S. 789, 805, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) ("It is well settled that the state may legitimately exercise its police powers to advance esthetic values."). We agree. But under *City of Ladue,* the erection of signs on residential property, a unique and important medium of expression, nonetheless may not be so broadly burdened.

The district court found that the "plaintiff and other residents of the Historic District may ... be free to post signs on their property (as long as they did not 'affix' the signs to their 'improvements')." *Lusk,* 418 F.Supp.2d at 327. At oral argument, the Village similarly maintained that Chapter 64 would not apply to a traditional yard sign that was not attached to, or leaning against, any structure. Tr. of Oral Arg. 21. Although this interpretation finds little support in the text of the ordinance,[10] we assume for present purposes that the ordinance would not have applied to Lusk's signs if they had been freestanding rather than leaning against his house. But accepting this odd reading of Chapter 64 does not aid residents of the Historic District who, like Lusk, do not have space in front of their houses to erect a free-standing sign.[11] For them, the ordinance, no less than the one at issue in *City of Ladue,* "almost completely foreclose[s] a venerable means of communication that is both unique and important," *City of Ladue,* 512 U.S. at 54, 114 S.Ct. 2038, at least pending Review Board approval.[12] And as in *City of Ladue,* the government's interest in the aesthetic appearance of the Historic District cannot justify such a broad restriction on speech. Unlike the statute in *City of Ladue,* of course, Chapter 64 of the Code does not ban speech outright. It prohibits speech for as long as seventy-five

10. Chapter 64–5 makes it unlawful for a homeowner to "permit or maintain any alteration to any improvement" in the historic district without the prior approval of the Review Board. The Code defines "alteration" as any "change, construction, reconstruction, repair, covering over or demolition of exterior architectural features of any existing improvement" or the *"[c]onstruction or placement of any new improvement on the property."* Code § 64–2(A) (emphasis added). The Code then defines "improvement" to include "[a]ny building or fixture ... including but not limited to houses, stores, warehouses, churches, schools, barns, fences, outhouses, pumps, gravestones, light fixtures, *outdoor signs* and other outdoor advertising fixtures." Code § 64–2(B) (emphasis added). Fences, pumps, and gravestones are rarely "affixed" to a building and yet are explicitly defined as an "improvement" by the ordinance. Thus, it would appear that under these provisions, the "construction" of an "outdoor sign," whether or not attached to another structure, is indeed an "alteration to any improvement" requiring prior approval by the Review Board.

11. The Village stated at oral argument that in its view Chapter 64 would require a resident to secure a COA even before displaying a standard presidential campaign sign inside his or her house window. Tr. of Oral Arg. 21.

12. The Village asserts that other means of communication are available because residents may hand out handbills or place advertisements in newspapers. Tr. of Oral Arg. 25. Yet in *City of Ladue,* the Court held that handbills and newspaper advertisements are not adequate substitutes for residential signs. *City of Ladue,* 512 U.S. at 56, 114 S.Ct. 2038.

days while the Village considers the sign owner's COA.[13] The ordinance's constitutionality hinges, then, on whether Chapter 64's licensing scheme is deficient because it requires residents to wait that long before being permitted to post such a sign. We conclude that it is. It remains an impermissibly broad ban on such speech, "at least for the time." *See Neb. Press Ass'n*, 427 U.S. at 559, 96 S.Ct. 2791 ("If it can be said that a threat of criminal or civil sanctions after publication 'chills' speech, prior restraint 'freezes' it at least for the time.") (citing Alexander Bickel, *The Morality of Consent* 61 (1975) ("Even if they are ultimately lifted they cause irremediable loss—a loss in the immediacy, the impact, of speech.... A criminal statute chills, prior restraints freeze.")); *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). Where, as here, a property owner wishes to take a public position on a pressing public issue, for example, or on the qualifications of a candidate for public office in an imminent election, the time required to obtain approval may prevent the property owner from doing so until after the public issue is settled or the election is over. Such belated approval is of little consolation to Lusk and those like him in this regard, and of little use to their neighbors or the political process. Nor, as *City of Ladue* instructs, does the possibility that Lusk may use some other more expensive or less convenient means to convey his message enable it to survive constitutional scrutiny. *City of Ladue*, 512 U.S. at 57, 114 S.Ct. 2038. In the end, the approval process itself renders the regulatory scheme invalid.[14]

The Village's aesthetic interests, then, do not justify the scope of the regulations because they "almost completely foreclose[ ] a venerable means of communication that is both unique and important," *City of Ladue*, 512 U.S. at 54, 114 S.Ct. 2038, while the Review Board considers an application for a COA. *See also Watchtower Bible*, 536 U.S. at 167, 122 S.Ct. 2080; *cf. City of Dallas*, 493 U.S. at 226, 110 S.Ct. 596 ("[A] prior restraint that fails to place limits on the time within which the decisionmaker must issue the license is impermissible."); *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 771–72, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988) ("[W]e cannot agree that newspaper publishers can wait indefinitely for a per-

---

**13.** The Board is required to "act on the application within forty-five (45) days of the first formal review by the Review Board," Code § 64–7, but the Review Board is only required to hold a regular meeting once a month, Code § 64–4, and nothing in the Code indicates that the Review Board convenes special meetings to act more quickly on COA applications.

**14.** The Village cites *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 122 S.Ct. 775, 151 L.Ed.2d 783 (2002), for the proposition that time limits for permits are not required if the regulation is content neutral. In *Thomas,* the Court did indeed hold that the *Freedman* requirements for constitutional prior restraints—"(1) any restraint prior to judicial review can be imposed only for a specified brief period during which the status quo must be maintained; (2) expeditious judicial review of that decision must be available; and (3) the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof once in court," *Thomas,* 534 U.S. at 321, 122 S.Ct. 775 (quoting *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 227, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) (O'Connor, J., principal opinion))—did not apply to content-neutral regulations. But here, even if these requirements were apposite under a *City of Ladue* analysis, the licensing scheme is hardly brief, there is no judicial review available, and the regulation does not require the Village to initiate litigation when denying a COA to a sign. Insofar as the *Freedman* factors are relevant to our analysis of a content-neutral regulation, the ordinance fails.

mit only because there will always be news to report.... [A] paper needs public access at a particular time; eventual access would come 'too little and too late.' " (quoting *Freedman,* 380 U.S. at 57, 85 S.Ct. 734)).

### V. The Standards Established by Chapter 64

■ We thus conclude that the method by which Chapter 64 standards are to be applied is constitutionally infirm. But the plaintiff would have us go further and hold that the standards themselves, when used as a basis for judging the permissibility of signage, violate the First Amendment on their face.[15] Lusk asks us to declare that the regulation of signs by reference to their "compatib[ility] with [the Historic District's] historic character, and with exterior features of neighboring properties," Code § 64(A)(2), is impermissible under the First Amendment. We decline to do so.

Here we depart from the *City of Ladue* analysis. We are not faced with the validity of the statute's effective proscription of the "entire medium" of residential signage for an extended period of time. What is now at issue is a challenge to the substantive criteria used by the statute to determine whether an outdoor sign should be permitted on residential property in the Historic District. There is no indication that the requirement of architectural and design compatibility, like the licensing scheme the Village employs to enforce it, necessarily implies the existence of a broad limitation on a unique and important medium of expression. But Lusk argues that, the *City of Ladue* test aside, the

particular standards that the Village ordinance employs, when analyzed as quotidian "time, place and manner" restrictions under intermediate scrutiny, are nonetheless constitutionally impermissible.

■ Generally, "time, place, and manner restrictions are permitted so long as they [survive intermediate scrutiny, i.e., they] are 'content neutral,' 'narrowly tailored to serve a significant governmental interest, ... leave open ample alternatives for communication,' and [also if they] do 'not delegate overly broad licensing discretion' to government officials." *Beal,* 184 F.3d at 124 (quoting *Forsyth County, Ga. v. Nationalist Movement,* 505 U.S. 123, 130, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992)).

> A government regulation that allows arbitrary application is inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view. To curtail that risk, a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license must contain narrow, objective, and definite standards to guide the licensing authority. The reasoning is simple: If the permit scheme involves appraisal of facts, the exercise of judgment, and the formation of an opinion by the licensing authority, the danger of censorship and of abridgment of our precious First Amendment freedoms is too great to be permitted.

*Forsyth County,* 505 U.S. at 130–31, 112 S.Ct. 2395 (internal quotation marks and citations omitted). The Supreme Court has warned that "[r]egulations which *per-*

---

**15.** "[A] facial challenge lies whenever a licensing law gives government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." *City of Lakewood,* 486 U.S. at 759, 108 S.Ct. 2138. In analyzing a facial challenge under the First Amendment, we consider only the text of the statute, not the application of the statute to a particular set of facts.

*mit* the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment." *Id.* at 135, 112 S.Ct. 2395 (emphasis added).

Lusk asserts that Chapter 64 fails to meet these criteria.. He argues, in effect, that Chapter 64 is invalid because it does not "set objective standards governing the grant or denial of license applications, [which are necessary] to ensure that [Village] officials [do] not have the 'power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers.'" *Charette v. Town of Oyster Bay*, 159 F.3d 749, 754 (2d Cir.1998) (quoting *City of Lakewood*, 486 U.S. at 759, 108 S.Ct. 2138). "[T]he question[, therefore, is] whether the provision does, as alleged, 'vest[ ] unbridled discretion in a government official over whether to permit or deny expressive activity.'" *Beal*, 184 F.3d at 125 (quoting *City of Lakewood*, 486 U.S. at 755, 108 S.Ct. 2138).

As noted, Chapter 64 provides:

Alteration of designated property shall be compatible with its historic character, and with exterior features of neighboring properties. In applying the principle of compatibility, the Review Board shall consider the following factors:

(a) The general design, character and appropriateness to the property of the proposed alteration or new construction;

(b) The scale of proposed alteration or new construction in relation to the property itself, surrounding properties, and the neighborhood;

(c) Texture and materials, and their relation to similar features of the properties in the neighborhood;

(d) Visual compatibility with surrounding properties, including proportion of the property's front facade, proportion and arrangement of windows and other openings within the facade and roof shape; and

(e) The importance of architectural or other features to the historic significance of the property.

Code § 64–7(A)(2).

While "[i]t is common ground that governments may regulate the physical characteristics of signs," *City of Ladue*, 512 U.S. at 48, 114 S.Ct. 2038, we are met at the threshold with an ambiguity in the text of Chapter 64 as to whether it is "physical characteristics" alone that the ordinance indeed regulates. Does it apply to the form of signs erected in the Historic District—i.e., their architecture and design— or the signage in its entirety—i.e., the content of the signs' proposed messages in addition to their architecture and design? To choose a familiar example, a hypothetical bulletin board signage on the exterior of a house of worship: Does Chapter 64 authorize the Review Board to make a judgment as to such a bulletin board's architecture and design—size, color, style, location and form—only? Or may the Board also take into account the sign's message—the name of the pastor and the title of her next sermon, or a quotation from the Quran or the Book of Revelations? Using a secular illustration: Does the ordinance permit the Board to assess a proposed theater marquee on the basis of its size, shape, decorative detail, lighting and the like only, or does it allow the Board to factor in a judgment as to the "historical character" or other characteristics of the announcement the marquee displays?

We think that if Chapter 64 authorizes the review of architecture and design of signage divorced from the signs' intended content, then Chapter 64–7(A)(2)'s "articulated standards" are both content neutral and sufficiently "narrow" and "definite."

*See Forsyth,* 505 U.S. at 133, 112 S.Ct. 2395. Although the criteria are, as the district court correctly noted, subjective in nature, *Lusk,* 418 F.Supp.2d at 328, they nevertheless are appropriate means of regulating non-speech, aesthetic endeavors such as architecture or construction. *Cf. Taxpayers for Vincent,* 466 U.S. at 805, 104 S.Ct. 2118 ("[I]t is well settled that the state may legitimately exercise its police powers to advance aesthetic values."). Indeed, we doubt that a municipality could maintain a reasonable level of architectural homogeneity or historical fidelity—both of which are proper governmental purposes—in the absence of judgments that are partly subjective. Yet these judgments are sufficiently tied to objective aesthetic standards, we think, to provide the necessary guidance to the licensor—the Review Board. If the Review Board's decision turns entirely on the compatibility of the architecture and design of an "improvement," including an "outdoor sign", *see* Code § 64–2(B), then, the ordinance is constitutional.[16]

On the other hand, if under Chapter 64 the Review Board is permitted to decide whether a sign *including its message* meets the chapter's criteria, we think the ordinance is, as Lusk argues, flawed. A standard requiring or allowing the Board to decide whether the *content* of signs such as Lusk's is "historically appropriate" is too imprecise to be a meaningful restraint on the exercise of the judgment of the Board's members. The Code's yardstick, if employed in this manner, would not act as an effective limitation on the ability of Village officials to base their decision-making, improperly, on the content of the speech they are regulating. *See City of Lakewood,* 486 U.S. at 757, 108 S.Ct. 2138. There is too great a danger that the official will refer to such statutory factors as "[t]he general design, character and appropriateness to the property of the proposed alteration" and the "[v]isual compatibility with surrounding properties, including proportion of the property's front facade," both largely inapposite to political signage, in order to prohibit a proposed sign when he or she disagrees with either the message or the messenger. *See id.* ("[T]he mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused."). While the ordinance may be content neutral on its face, signs erected or to be erected could be judged on the basis of

---

**16.** Content-neutral criteria for political and other signage that are sufficiently objective and precise, and that permit residents to engage in some form of spontaneous speech, have been held to be constitutionally permissible. *See, e.g., La Tour v. City of Fayetteville,* 442 F.3d 1094, 1097 (8th Cir.2006) (upholding an ordinance banning the use of flashing electric signs on the ground that the plaintiff had "ample alternative channels to communicate his messages including non-electronic signs and his electronic sign operating in a non-flashing manner"); *Riel v. City of Bradford,* 2005 WL 2106554, at *6 (W.D.Pa. Aug.31, 2005), 2005 U.S. Dist. LEXIS 18704, at *20 (in upholding a content-neutral limitation on sign sizes, noting that since a homeowner "can place any 'for cause' sign on his

or her property, provided it does not exceed 12 square feet[,] ... the 'pernicious effects' of the *Watchtower Bible* permitting system—i.e., the loss of speaker anonymity associated with the application process, the 'burden' of undergoing the application process, and the potential suppression of spontaneous speech—may all be avoided"); *Sugarman v. Vill. of Chester,* 192 F.Supp.2d 282, 295 (S.D.N.Y.2002) (upholding an ordinance limiting the size of signs as "a reasonable restriction furthering Greenwood Lake's interests in aesthetics, property values and safety that does not unduly restrict political speech"). We of course cannot and do not state or imply whether we agree with the specific conclusions of any of these courts on the facts before them.

their content—whether Village officials agree or disagree with the point of view that is expressed.

■ Happily, we need go no further in our analysis. Principles of statutory construction teach that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, we may construe the statute to avoid such problems unless such construction is plainly contrary to the intent of [the Legislature]." *Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 177 (2d Cir.2006) (citing *Empire HealthChoice Assur., Inc. v. McVeigh*, 396 F.3d 136, 144 (2d Cir.2005)) (quoting *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988)) (internal quotation marks omitted). As we have explained, we think that the construction of Chapter 64 is constitutional when applied to general principles of architecture and design, even though its specific application to the content of any signage would not be. This reading of the ordinance is, moreover, consistent with the Village's intent in adopting it, judging from its choice of words such as "general design, character and appropriateness to the property," "scale of proposed alteration or new construction," "[t]exture and materials," "[v]isual compatibility with surrounding properties," and "[t]he importance of architectural or other features to the historic significance of the property." *See* Code §§ 64–7(A)(2)(a), (b), (c), (d), and (e). And we have been presented with no evidence of a legislative intent to the contrary. We therefore read Chapter 64 to apply to architecture and design only and thus interpret it not to authorize the Review Board to review, approve, or disapprove of the content of any proposed or existing signage.[17] Interpreted thus, we conclude that the ordinance is constitutional.

To be sure, Chapter 64 may be subject to abuse. One day, someone may complain that a particular exercise of the Review Board's discretionary authority constitutes an assault upon or threat to his or her First Amendment right to free expression. *Cf. Spence v. Washington*, 418 U.S. 405, 410–11, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974) (finding petitioner's expressive conduct protected by the First Amendment because "[a]n intent to convey a particularized message was present, and in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it"). The Review Board might, for example, use its approval authority to prevent speech of those whose politics or religious views diverge from those of a majority of the Board, with or without reference to a particular message that has been posted or proposed. This, however, is not such a case. We therefore leave for another day the determination of whether, in a particular case, the ordinance's approval authority has been used improperly on the basis of the message rather than the medium.

## CONCLUSION

For the foregoing reasons, we reverse the judgment of the district court insofar as it was appealed to us and remand the matter to the court with instructions for it to fashion such relief consistent with this opinion as it deems appropriate.

---

**17.** In other words, assuming a constitutional system for review, Mr. Lusk could be required to present the form of his signs, but not their content, to the Review Board for its assessment.