**Grace Chadderton RICHARDS, Plaintiff,**

v.

**Janet NAPOLITANO, Secretary of the U.S. Department of Homeland Security, John P. Torres, Acting Assistant Secretary, U.S. Immigration and Customs Enforcement, and Michael Aytes, Acting Deputy Director, U.S. Citizenship and Immigration Services, Defendants.**

No. 09–CV–1663 (CPS).

United States District Court, E.D. New York.

June 30, 2009.

---

1. Rafal, born on June 6, 1994, is now thirteen years old.

Jeffrey Adam Feinbloom, Feinbloom Bertisch LLP, New York, NY, for Plaintiff.

Dione M. Enea, Elliot M. Schachner, United States Attorneys Office, Brooklyn, NY, for Defendants.

## MEMORANDUM OPINION AND ORDER

SIFTON, Senior District Judge.

On April 22, 2009, plaintiff Grace Chadderton Richards commenced this action against defendants Janet Napolitano, Secretary of the United States Department of Homeland Security, John P. Torres, Acting Assistant Secretary of United States Immigration and Customs Enforcement, and Michael Aytes, Acting Deputy Director of United States Citizenship and Immigration Services ("USCIS"). Plaintiff claims that defendants' actions violated her statutory rights under the Immigration and Nationality Act, 8 U.S.C. § 1101 et seq. ("INA"), as well as the standards set forth in the Administrative Procedures Act, 5 U.S.C. § 701 et seq. ("APA"). Plaintiff seeks declaratory and injunctive relief as well as a writ of mandamus under the Mandamus Act, 28 U.S.C. § 1361, inter alia, enjoining USCIS from determining that plaintiff is no longer a "spouse" within the meaning of 8 U.S.C. § 1151(b)(2)(A)(i), and directing USCIS to reopen her I–130 petition and I–485 application and to adjudicate them on the mer-

its. Plaintiff also seeks an award of costs and reasonable attorney's fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 et seq.

Presently before this Court are the parties' submissions in response to my Order dated April 27, 2009, directing them to show cause why the relief requested in plaintiff's petition should not be granted. For the reasons set forth below, plaintiff's requests for declaratory judgment, mandamus relief, and injunctive relief are granted in part and denied in part, and her request for costs and attorney's fees is denied without prejudice.

## BACKGROUND

The following undisputed facts are drawn from plaintiff's Complaint and Petition for Writ of Mandamus ("Compl."). Plaintiff was born in Barbados in 1956. Compl. ¶ 11. She visited the United States numerous times under the terms of a multiple-entry, non-immigrant visitor's visa issued in 1995. Id. During a visit to the United States in 2000, plaintiff was introduced to Mr. Ricky Richards, a natural-born citizen of the United States, by Mr. Richard's cousin. Id. ¶ 12. They eventually began and maintained a long-distance romantic relationship for several years. Id.

Sometime after July 31, 2004, Mr. Richards proposed marriage to plaintiff. Id. ¶ 13. Plaintiff accepted and moved in with Mr. Richards and his mother in December of 2004. Id. On July 28, 2005, plaintiff and Mr. Richards married in Brooklyn, New York. Id. ¶ 12. Plaintiff continues to reside with Mr. Richard's mother. Id.

On January 25, 2006, Mr. Richards filed with the United States Citizenship and Immigration Services ("USCIS") an I–130 alien relative petition (the "I–130 petition") on plaintiff's behalf, and on the same day,

plaintiff filed an I–485 application (the "I–485 application") to adjust her status to that of a lawful permanent resident. *Id.* ¶ 15. In connection with the I–130 petition and the I–485 application, an officer of USCIS conducted an interview of plaintiff and Mr. Richards on August 8, 2006. *Id.* ¶ 18. The couple appeared on the scheduled date, but no decision was made on either the I–130 petition or the I–485 application.[1] *Id.* At the conclusion of the interview, the USCIS officer marked plaintiff's passport "pending" and advised plaintiff and Mr. Richards that they would be notified of a decision by mail. *Id.*

On September 18, 2006, Mr. Richards died. *Id.* ¶ 19. At some point following Mr. Richards' death, USCIS directed plaintiff and Mr. Richards to appear for a second interview on July 9, 2007. *Id.* ¶ 20. Plaintiff retained counsel and appeared at the second interview, where she presented Mr. Richards' death certificate to agency officials. *Id.* ¶ 21. During the interview, the adjudicating officer explained to plaintiff that it was the agency's policy to deny I–130 petitions where the citizen spouse had died prior to the two-year anniversary of the marriage. *Id.* ¶ 22. At the conclusion of the interview, the officer advised plaintiff that she would receive a denial notice in the mail. *Id.*

By notice dated February 4, 2009, and by decision dated February 6, 2009 (the "Decision"), USCIS denied the I–130 petition without addressing whether the marriage was bona fide. Instead, USCIS stated that it "has no authority to approve an alien relative petition after the petitioner's death." *Id.* ¶ 24, *see also id.* Ex. A (copy of notice and attached decision). The agency relied on two cases decided by the Board of Immigration Appeals ("BIA") in concluding that it was "constrained to deny the petition." *Id.* Ex. A. Further, the Decision noted that even if no BIA precedent existed on the issue of a petitioner's death while a petition is pending, the INA required USCIS to deny the petition because following Mr. Richards' death, plaintiff no longer qualified as an "immediate relative" within the meaning of the INA as she ceased to be the "spouse" of a United States citizen at that time. *Id.*

There is no dispute that USCIS routinely grants I–130 petitions and I–485 applications filed on behalf of aliens who have been married to United States citizens for less than two years. *Id.* ¶ 26.

By Notice to Appear ("NTA") dated April 4, 2009, USCIS commenced removal proceedings against plaintiff. *Id.* ¶ 28; *see also id.* Ex. B (copy of NTA). A hearing in these proceedings has been scheduled for July 9, 2009.[2] *Id.* The NTA alleges, *inter alia*, that plaintiff "remained in the United States beyond January 30, 2005, without authorization from the [USCIS]," and charges plaintiff with being removable

---

1. The parties dispute whether the plaintiff's and Mr. Richard's responses to the USCIS officer's questions during the interview created doubts as to whether their marriage was bona fide. This dispute is immaterial, however, because whether the marriage was bona fide is not at issue here.

2. At oral argument on June 25, 2009, the government represented that in light of the Department of Homeland Security's recent decision to defer removal proceedings initiated against widow(er)s like plaintiff who were denied "immediate relative" classification solely on account of their spouse's death before the two-year anniversary of their marriage, pending issuance of guidance regarding the widow(er)'s legal status, the government was prepared to request an adjournment of the July 9, 2009 hearing. However, the government was unable to indicate the length of the adjournment it was prepared to seek, nor did it state that its position with regard to the denial of plaintiff's I–130 petition and her placement in removal proceedings had in any way changed.

from the United States pursuant to section 237(a)(1)(B) of the INA, "in that after admission ... [she] remained in the United States for a time longer than permitted, in violation of [the INA]." *Id.;* 8 U.S.C. § 1227(a)(1)(b). The Immigration Judge who will preside over the July 9, 2009 hearing has authority to order plaintiff's removal from the United States. *Id.* ¶ 34. However, the Immigration Judge lacks jurisdiction over the I–130 petition and lacks authority to compel USCIS to reconsider its denial of the I–130 petition or the I–485 application. *Id.* Plaintiff does not qualify for any form of relief from removal. *Id.* ¶ 35. Therefore, absent appropriate relief from this Court, the Immigration Judge would be compelled to order plaintiff's removal from the United States. *Id.*

## DISCUSSION

### I. *Jurisdiction*

█ Although the parties have not raised the issue, I note that this Court has subject matter jurisdiction under 28 U.S.C. § 1331, which grants courts general federal question jurisdiction, and Section 704 of the APA, 5 U.S.C. § 704, to review the meaning of the terms "immediate relative" and "spouse" as they appear in 8 U.S.C. § 1151(b)(2)(A)(i). Because these are purely legal questions which do not implicate agency discretion, the INA's jurisdictional bar, 8 U.S.C. § 1252(a)(2)(B)(ii), which precludes judicial review of most discretionary immigration decisions, does not apply in this case. *See Arar v. Ashcroft,* 414 F.Supp.2d 250, 267–73 (E.D.N.Y. 2006) (citing, *inter alia, Sepulveda v. Gonzales,* 407 F.3d 59 (2d Cir.2005)). Further, for reasons stated more fully below, this Court has mandamus jurisdiction pursuant to 28 U.S.C. § 1361.

### II. *Standard of Review*

█ The APA empowers courts to "hold unlawful and set aside" not only agency actions and conclusions that are "arbitrary" or "capricious," but also agency actions and conclusions that are "otherwise not in accordance with law" or are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). "When the agency action is based on an interpretation of its governing statute, [courts] must consider whether that interpretation is entitled to deference and, if so, how much." *N.Y. Public Interest Research Group v. Whitman,* 321 F.3d 316, 324 (2d Cir.2003) (citing, *inter alia, Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (mandatory deference); *Skidmore v. Swift & Co.,* 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944) (deference according to persuasiveness)). If "the statutory text is plain and unambiguous," however, the court "must apply the statute according to its terms." *Carcieri v. Salazar,* —— U.S. ——, 129 S.Ct. 1058, 1063–64, 172 L.Ed.2d 791 (2009). In other words, no deference is due to an agency's interpretation that contravenes Congress' unambiguously expressed intent. *Whitman,* 321 F.3d at 324.

### III. *Statutory and Regulatory Background*

A United States citizen who seeks to gain lawful permanent resident ("LPR") status for an alien family member must begin the process by filing an I–130 petition with USCIS on behalf of the alien family member, seeking classification of the alien as the citizen's "immediate relative." 8 U.S.C. §§ 1151(b)(2)(A)(i), 1154(a)(1)(A)(i); 8 C.F.R. § 204.1(a)(1). The INA defines "immediate relatives" as follows:

For purposes of this subsection, the term "immediate relatives" means the

children, spouses, and parents of a citizen of the United States, except that, in the case of parents, such citizens shall be at least 21 years of age. In the case of an alien who was the spouse of a citizen of the United States for at least 2 years at the time of the citizen's death and was not legally separated from the citizen at the time of the citizen's death, the alien ... shall be considered, for purposes of this subsection, to remain an immediate relative after the date of the citizen's death but only if the spouse files a petition under section 1154(a)(1)(A)(ii) of this title [an I–360 petition] within 2 years after such date and only until the date the spouse remarries.

8 U.S.C. § 1151(b)(2)(A)(i). If a United States citizen spouse dies without filing a petition on behalf of an alien spouse, an alien spouse "described in the second sentence of section 1151(b)(2)(A)(i)"—*i.e.,* "who was the spouse of a citizen of the United States for at least 2 years at the time of the citizen's death and was not legally separated from the citizen at the time of the citizen's death"—may also file a petition for classification as an immediate relative on Form I–360. 8 U.S.C. § 1154(a)(1)(A)(ii); 8 C.F.R. §§ 204.1(a)(2), 204.2(b).

■ During the course of adjudicating an I–130 or an I–360 petition, USCIS must conduct an investigation to determine whether "the facts stated in the petition are true and ... the alien in behalf of whom the petition is made is an immediate relative[.]" 8 U.S.C. § 1154(b). Approval of an I–130 or an I360 petition turns on whether the marriage relationship was bona fide "at its inception." *Matter of McKee,* 17 I. & N. Dec. 332 (BIA 1980) (establishing that parties' intent at time of marriage controls whether marriage was bona fide); *see also Huarcaya v. Mukasey,*

550 F.3d 224, 231 (2d Cir.2008) ("we agree with the government that marriage-based visa eligibility has always meant that a petitioner had to demonstrate that [the] marriage was bona fide"). If the facts stated in the petition are true and the alien qualifies as an "immediate relative," USCIS "shall" approve the petition. 8 U.S.C. § 1154(b).

Approval of an I–130 or I–360 petition classifies the alien "immediate relative" within a specific immigrant class, and permits the alien to apply for an immigrant visa if the alien is abroad, or to seek adjustment of status to that of a lawful permanent resident if the alien is present in the United States. 8 U.S.C. §§ 1201(a)(1), 1202(a), 1255(a). If, however, after the I–130 or I–360 petition is approved, USCIS later determines that the alien is not an "immediate relative," the petition may be revoked effective as of the date it was approved. *See* 8 U.S.C. § 1155 (providing for petition revocation upon a finding of "good and sufficient cause").

An alien seeking adjustment of status must file an I–485 application, which may be filed concurrently with an I–130 or I–360 petition or thereafter. 8 U.S.C. § 1255(a); 8 C.F.R. §§ 245.1(a), 245.2(a)(2)(i)(B) & (C). Approval of the I–485 application, which is within the discretion of USCIS, results in the conferral of LPR status.

IV. *Analysis*

■ This matter turns on whether plaintiff should be able to qualify as an "immediate relative" of her late husband under 8 U.S.C. § 1151(b)(2)(A)(i), despite the fact that her husband died before the two-year anniversary of their marriage. If so, then USCIS's denial of the I–130 petition solely on account of her husband's untimely death was not in accordance with

law. At the outset, I note the existence of a difference of opinion among appellate courts in cases involving the same issue and virtually identical facts. The First, Sixth, and Ninth Circuits have concluded that, for the purposes of § 1151(b)(2)(A)(i), a surviving spouse should be able to qualify as an "immediate relative" if her deceased spouse filed an I–130 petition on her behalf. *See Taing v. Napolitano*, 567 F.3d 19 (1st Cir.2009); *Lockhart v. Napolitano*, 561 F.3d 611 (6th Cir.2009); *Freeman v. Gonzales*, 444 F.3d 1031 (9th Cir. 2006). In contrast, the Third Circuit, with one judge dissenting, has ruled otherwise. *Robinson v. Napolitano*, 554 F.3d 358 (3d Cir.2009). The Second Circuit has not yet had occasion to rule on this issue.

## A. *Interpretation of the Relevant Statute*

### 1) *Text and Structure of Statute*

As set forth above, the relevant portion of the INA provides that:

> [T]he term "immediate relatives" means the children, spouses, and parents of a citizen of the United States, except that, in the case of parents, such citizens shall be at least 21 years of age. In the case of an alien who was the spouse of a citizen of the United States for at least 2 years at the time of the citizen's death and was not legally separated from the citizen at the time of the citizen's death, the alien ... shall be considered, for purposes of this subsection, to remain an immediate relative after the date of the citizen's death but only if the spouse files a petition under section 1154(a)(1)(A)(ii) of this title [an I–360 petition] within 2 years after such date

and only until the date the spouse remarries.

8 U.S.C. § 1151(b)(2)(A)(i).

The starting point for interpretation of a statute "is always its language." *Cmty. for Creative Non–Violence v. Reid*, 490 U.S. 730, 739, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989). "Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis." *Dolan v. U.S. Postal Service*, 546 U.S. 481, 486, 126 S.Ct. 1252, 163 L.Ed.2d 1079 (2006). In understanding and applying a regulatory scheme, courts should interpret statutes to be coherent and internally consistent. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000).

The plain language of the first sentence of § 1151(b)(2)(A)(i) expressly includes "spouses" within the definition of "immediate relatives." In that first sentence, only "parents" are subject to any limitation in qualifying as "immediate relatives," as their citizen children must be at least 21 years of age in order for them to qualify. There is no comparable qualifier for the term "spouses." Therefore, I must assume that Congress intended no limitation on that term beyond the requirement set forth elsewhere in the INA that both parties be present for the marriage ceremony.[3] *See Taing*, 567 F.3d at 25–26; *Lockhart*, 561 F.3d at 616; *Freeman*, 444 F.3d at 1039 (quoting *Keene Corp. v. U.S.*, 508 U.S. 200, 208, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993) ("[W]here Congress includes particular language in one section of a statute but omits it in another ..., it is

---

**3.** In the definition section of the INA, the term "spouse" is negatively defined only to the extent it excludes "a spouse, wife, or husband by reason of any marriage ceremony where the contracting parties thereto are not physically present in the presence of each other, unless the marriage shall have been consummated." 8 U.S.C. § 1101(a)(35).

generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.")).

The government argues, however, that the second sentence of § 1151(b)(2)(A)(i) must be read together with the first sentence in order to determine the meaning of the word "spouse" in the first sentence. In the government's view, the second sentence controls whether and when alien widows and widowers may qualify as "immediate relatives." Therefore, according to the government, the second sentence expressly modifies the term "spouses" in the first sentence to exclude from the definition of "immediate relatives" those alien widows and widowers who were not married to a United States citizen for at least two years at the time of the citizen's death. In support of this argument, the government relies on a case decided in the Southern District of New York in 1999, as well as the Third Circuit's recent decision in *Robinson. See Burger v. McElroy*, No. 97 CIV. 8775, 1999 WL 203353, at *5 (S.D.N.Y.1999) (the second sentence of § 1151(b)(2)(A)(i) "specifically addresses when widows and widowers of U.S. citizens will be considered 'immediate relatives' "); *Robinson*, 554 F.3d at 365 ("the second sentence [of § 1151(b)(2)(A)(i) ] qualifies which spouses of deceased citizens are immediate relatives"). I am unpersuaded by this argument for several reasons.

The appellate courts in *Taing, Lockhart,* and *Freeman* concluded that the second sentence of § 1151(b)(2)(A)(i), rather than modifying the first sentence as the government contends, is most logically read as creating a separate and independent right for certain alien spouses to self-petition for "immediate relative" status. I agree. This reading flows more naturally from the text and structure of the statute. As the First Circuit noted in *Taing,* the second sentence "addresses the situation of an alien spouse whose husband or wife died before filing an I–130 petition .... There is nothing in the language of the second sentence to imply that it was intended to strip away 'spouse' status from a surviving spouse whose deceased spouse had already filed an I–130 petition." *Taing,* 567 F.3d at 27.[4]

In addition, this reading is supported by the statute's context within the INA. First, 8 U.S.C. § 1154, which, as its caption indicates, governs the "[p]rocedure for granting immigrant status," likewise sets forth dual processes for citizens and certain alien spouses to petition for classification of aliens as "immediate relatives." Section 1154(a)(1), which sets forth who may file petitions, provides both that "any citizen of the United States claiming that an alien is entitled to ... an immediate relative status ... may file a petition," *see* 8 U.S.C. § 1154(a)(1)(A)(i), and that "[a]n alien spouse described in the second sentence of section 1151(b)(2)(A)(i) of this title *also* may file a petition[.]" 8 U.S.C. § 1154(a)(1)(A)(ii) (emphasis added). Both the *Freeman* and *Taing* courts found the use of the word "also" in this provision significant. *See Freeman,* 444 F.3d at

---

4. The government argues that the tense of the second sentence of § 1151(b)(2)(A)(i) in referring to "an alien who *was* the spouse of a citizen" (emphasis added) supports the conclusion that the term "spouses" in the first sentence cannot include aliens whose citizen spouses are deceased. This reading, however, does not take account of the context of the phrase "an alien who was the spouse of a citizen." When viewed in context, the past-tense term "was" clearly relates to the marriage durational requirement for a self-petitioning widow(er), *i.e.,* that he or she must have been the spouse of a citizen "for at least 2 years at the time of the citizen's death" in order to self-petition. Therefore, the use of the term "was" does not, as the government contends, imply that plaintiff is no longer a "spouse."

1042 n. 17 ("The inclusion of the word 'also' in this subsection, as compared to the right given to living citizen spouses . . . further establishes that the right of self-petition is given to a select group of alien widows as an alternative to their citizen spouse's I-130 filing."), *cited in Taing,* 567 F.3d at 26–27. Thus, the language and structure of § 1154(a)(1)(A)(i) & (ii) support the conclusion that the second sentence of § 1151(b)(2)(A)(i) confers a separate right of self-petition on certain alien spouses, rather than modifying the right of citizens to petition on behalf of their alien spouses. *See Freeman,* 444 F.3d at 1041–42 ("The distinction the regulations draw between the rights of a citizen spouse to petition as compared to those of an alien widow to self-petition is consistent with a congressional intent to create two different processes, such that one or the other applies—either the citizen spouse petitions or, if he dies without doing so, the alien widow may do so."), *cited in Lockhart,* 561 F.3d at 617; *see also Taing,* 567 F.3d at 26–27.[5]

The provisions set forth in 8 U.S.C. § 1186a further support this conclusion.

Section 1186a was enacted as part of the Immigration Marriage Fraud Amendments of 1986, which were intended to prohibit fraudulent marriages. *See* Pub. L. No. 99–639, 100 Stat. 3537 (1986); *Azizi v. Thornburgh,* 908 F.2d 1130, 1137 (2d Cir.1990) (Cardamone, J., dissenting). Under § 1186a, an alien who marries a United States citizen may receive permanent resident status as an "immediate relative" only on a conditional basis prior to the two-year anniversary of the qualifying marriage. Section 1186a(b)(1)(A) permits termination of that status if it is found that the marriage "(i) was entered into for the purpose of procuring an alien's admission as an immigrant, or (ii) has been judicially annulled or terminated, *other than through the death of a spouse* [.]" 8 U.S.C. 1186a (b)(1)(A)(i)-(ii) (emphasis added). As both the *Freeman* and *Taing* courts noted, by excepting a spouse's death, the language of § 1186a(b)(1)(A)(ii) presents "compelling evidence that Congress did not intend its provision for a widow's self-petition for adjustment of status to have an implicit collateral consequence of terminating a spouse's already pending petition—particularly when the effect would be to fore-

---

**5.** While I do not rely on the fact, as I find that the text of § 1151(b)(2)(A)(i) is plain and unambiguous, I further note that the legislative history of §§ 1151 and 1154 supports the conclusion that Congress intended to create a separate right for certain alien spouses to self-petition for "immediate relative status" when it added the second sentence of § 1151(b)(2)(A)(i). The second sentence was added as part of the 1990 amendments to the INA. *See* Immigration Act of 1990, Pub.L. 101–649, § 101, 104 Stat. 4978, 4981 (1990). Prior to those amendments, alien widows and widowers had no right to self-petition for classification as "immediate relatives." The procedural provision in § 1154 to which the second sentence of § 1151(b)(2)(A)(i) referred at the time it was added in 1990 was subsequently altered the next year to provide that "[a]n alien described in the second sentence

of section [1151](b)(2)(A)(i) also may file a petition with the Attorney General under this subparagraph for classification under such section." *See* Miscellaneous and Technical Immigration and Naturalization Amendments of 1991, Pub. L. 102–232, § 302(e)(4) (A), 105 Stat. 1733, 1745 (1991). The logical conclusion is that § 1154 was altered to clarify the procedure by which the new right described in § 1151 was to be implemented. Far from being superfluous, as the government argues must be the case under plaintiff's reading of § 1151, the 1991 and subsequent revisions to § 1154 expressly including certain alien spouses among those who may file petitions support the conclusion that Congress did not intend the second sentence of § 1151(b)(2)(A)(i) to alter the citizen spouse's right described in the first.

close a grieving widow from any adjustment at all 'through the death of [her] spouse.'" *Freeman*, 444 F.3d at 1042, *cited in Taing*, 567 F.3d at 26–27.[6]

Mindful that in interpreting § 1151(b)(2)(A)(i), I must "determine whether the language at issue has a plain and unambiguous meaning," which involves an inquiry into "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole," I find that the language of § 1151(b)(2)(A)(i), viewed by itself and read together with § 1154 and § 1186a, plainly and unambiguously demonstrates Congress' intent to make alien spouses eligible for "immediate relative" classification upon petition of a citizen spouse, regardless of whether the citizen spouse dies before the petition is adjudicated, as well as to provide for a separate right of self-petition for certain alien spouses. Accordingly, I need not defer to USCIS' interpretation of the statute. *N.Y. Public Interest Research Group v. Whitman*, 321 F.3d 316, 324 (2d Cir.2003).

### 2) *Ordinary Meaning of "Spouse"*

In addition, the ordinary meaning of the term "spouse" supports my conclusion that plaintiff continues to be a "spouse" within the meaning of the first sentence of § 1151(b)(2)(A)(i). In construing a term in a statute, courts look to "the language employed by Congress and [assume] that the ordinary meaning of that language accurately expresses the legislative purpose." *Engine Mfrs. Ass'n v. South Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252, 124 S.Ct. 1756, 158 L.Ed.2d 529 (2004) (citation omitted). Where Congress has not defined a term, in determining the term's ordinary meaning, courts refer to dictionary definitions. *See id.* (citing the dictionary definition of a term appearing in the relevant statute).

As previously mentioned, the INA provides no affirmative definition of the term "spouse." *See supra* n. 3. At the time the second sentence of § 1151(b)(2)(A)(i) was added in 1990, the definition of the term "spouse" that appeared in the then-current edition of Black's Law Dictionary was as follows:[7]

---

**6.** The government argues that the exception for marriages terminated "through the death of a spouse" set forth in § 1186a(b)(1)(A)(ii) is irrelevant to the interpretation of § 1151(b)(2)(A)(i). According to the government, the "death of a spouse" exception was created to distinguish between marriages which may have been fraudulent and marriages which were likely bona fide. Generally speaking, there is a greater likelihood that a marriage was fraudulent if it is terminated within two years than if it is not terminated during that time. However, if the reason for the termination within two years was the death of a spouse, the likelihood that the marriage was fraudulent is substantially reduced. According to the government, because the "death of a spouse" exception deals solely with the substantive issue of whether a marriage is lawful, it cannot support plaintiff's contention that she meets the threshold requirement of qualifying as a "spouse" within the meaning of the "immediate relatives" def-

inition set forth in the first sentence of § 1151(b)(2)(A)(i). I disagree. Like the *Freeman* court, I find that the "death of a spouse" exception in § 1186a(b)(1)(A)(ii) is further evidence of Congress' intent not to foreclose an alien spouse from adjustment of status purely on account of the death of the citizen spouse. *See Freeman*, 444 F.3d at 1042.

**7.** The parties have relied on the version of Black's Law Dictionary current as of 1990 in discussing the meaning of the term "spouse." Adopting the reasoning employed by the First Circuit in *Taing*, I also rely on that version. *See Taing*, 567 F.3d at 25 n. 4 ("We rely on the sixth edition [of Black's Law Dictionary], as opposed to an earlier edition, because it logically follows that Congress, when amending the statute, intended for the term "spouse" in the first sentence to carry the same meaning as it does in the second sentence.").

**Spouse.** One's husband or wife, and "surviving spouse" is one of a married pair who outlives the other.

*Black's Law Dictionary* 1042 (6th ed. 1990). Plaintiff, as "one of a married pair who outlives the other," qualifies as a "surviving spouse." Because this term is subsumed within the dictionary definition of "spouse," it follows that plaintiff is a "spouse" within the ordinary meaning of that term.

Despite the plain language of the dictionary definition of "spouse," however, the government contends that a "surviving spouse" should not be considered a "spouse" as that term is used in the first sentence of § 1151(b)(2)(A)(i) because, elsewhere in the INA, Congress has distinguished between "spouse" and "surviving spouse." [8] This argument is unpersuasive. The fact that Congress at times clarified the type of spouse to which other INA provisions refer by employing the term "surviving spouse" does not affect the meaning of the term "spouse" where, in context, that term can only logically be interpreted to mean "surviving spouse." In the second sentence of § 1151(b)(2)(A)(i), for instance, an alien who "was the spouse of a citizen of the United States for at least 2 years at the time of the citizen's death" can only logically be understood to be a "surviving spouse," although only the term "spouse" is employed throughout the provision. [9] Further, given that Congress used the term "spouse" in the first sentence of § 1151(b)(2)(A)(i) to refer to a living

spouse, while the same term can only mean "surviving spouse" in the second sentence, "[t]he fact that within the same subsection, Congress uses the word 'spouse' to refer to a living spouse and a surviving spouse lends support to the argument that it intended for 'spouse' to include surviving spouse." *Taing,* 567 F.3d at 26 (citing *Freeman,* 444 F.3d at 1039–41; *Robinson,* 554 F.3d at 369 (Nygaard, J. dissenting)).

Similarly, the government contends that Congress did not intend for a "surviving spouse" to qualify as a "spouse" because it knows how to provide for a familial relationship to continue after death for immigration purposes, and has done so with regard to other relationships. In support of this argument, the government points primarily to the INA's definition of "parent" in 8 U.S.C. § 1101(c)(2), which expressly includes "deceased parent." As the government concedes, however, the INA contains no useful definition of the term "spouse," which suggests that Congress intended for the ordinary meaning of the term "spouse" to control. As previously discussed, the ordinary meaning of "spouse" includes "one of a married pair who outlives the other," or "surviving spouse."

Finally, the government argues that plaintiff is no longer a "spouse" because her marriage ended upon the death of her husband. The concept that marriage ends upon the death of one spouse is well estab-

---

8. Specifically, the government refers to 8 U.S.C. §§ 1101(a)(27)(H) and (I)(ii) (definitions of "special immigrant"); 8 U.S.C. §§ 1430(a), (b), & (d) (naturalization of certain individuals); 8 U.S.C. § 1439(g) (naturalization through service in the armed forces); 8 U.S.C. § 1612(a)(2)(C)(iii) (eligibility of aliens for certain federal programs); 8 U.S.C. § 1613(b)(2)(C) (eligibility for federal means-tested public benefits); 8 U.S.C.

§ 1622(b)(3)(C) (eligibility for certain state programs).

9. The second sentence of § 1151(b)(2)(A)(i) employs the term "spouse" three times in a way that can only be understood to mean "surviving spouse," lending further support to the conclusion that a "surviving spouse" is a type of "spouse."

lished under New York law. *See Hallinckx v. Stenbeck*, 307 A.D.2d 915, 762 N.Y.S.2d 903, 903 (2d Dep't 2003) ("It is well-settled that the death of one party to a divorce action prior to judicial determination dissolving the marriage causes the action to abate since the marital relationship between the parties no longer exists.") (citing *Cornell v. Cornell*, 7 N.Y.2d 164, 169, 196 N.Y.S.2d 98, 164 N.E.2d 395 (N.Y.1959)). But the issue here is not whether plaintiff remains legally married; rather, it is whether she qualifies as a "spouse." The fact that plaintiff's marriage reached its legal conclusion upon her husband's death does not control whether plaintiff remains her deceased husband's "spouse," as that term is commonly understood.

### 3) *Result of Interpretation of Statute*

█ It is a cardinal rule of statutory construction that "[a] statute should be interpreted in a way that avoids absurd results." *U.S. v. Dauray*, 215 F.3d 257, 264 (2d Cir.2000); *see also Clinton v. N.Y.*, 524 U.S. 417, 419, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998) ("Acceptance of the Government's new-found reading ... would produce an absurd and unjust result which Congress could not have intended"). Each of the *Freeman, Lockhart,* and *Taing* courts, as well as the dissenting judge in *Robinson*, concluded that the government's reading of § 1151(b)(2)(A)(i) would "create[ ] an arbitrary, irrational and inequitable outcome in which approvable petitions will be treated differently depending solely upon when the government grants the approval." *Taing*, 567 F.3d at 31 (quoting *Lockhart*, 561 F.3d at 620 (quoting *Robinson*, 554 F.3d at 371 (Nygaard,

J., dissenting))); *see also Freeman*, 444 F.3d at 1043 ("an alien's status as a qualified spouse should not turn on whether DHS happens to reach a pending application before the citizen spouse happens to die"). I agree that Congress did not intend for plaintiff, whose properly filed I-130 petition was eligible for approval prior to her husband's death, to be penalized simply because USCIS did not happen to adjudicate her petition before she became a widow.[10] As Judge Nygaard colorfully concluded in his dissent in *Robinson*:

> [I]t is inconceivable to me that Congress intended an alien's status to be contingent upon the amount of time that the executive department takes to process a timely and proper petition—a factor completely outside of the control of the alien .... Nor do I believe that Congress intended to sanction the disregard that the department has shown towards persons like [plaintiff]. She has committed no crime. She is innocent of any misbehavior. She is a grieving widow .... This same department whose delay or inaction forecloses [plaintiff]'s chance of becoming an American, now so diligently pursues the avenues of her expulsion.... My view ... is that it is untoward of this nation of immigrants, we who have passed through the portals of citizenship, to coldly and impassively slam the door behind us on innocent aspirants who dream to follow.

*Robinson*, 554 F.3d at 371 (Nygaard, J., dissenting).

### B. *Government's Remaining Arguments*

The government's remaining arguments are unpersuasive in light of my conclusions above. I consider each in turn.

---

10. In so holding, I need not determine whether USCIS engaged in undue delay in adjudicating plaintiff's I-130 petition. The issue is not whether USCIS is at fault for not addressing the petition in a timely manner. Rather, the issue is whether Congress intended the timing of USCIS's adjudication process to control whether an alien whose United States citizen spouse dies before the two-year anniversary of the marriage is eligible to qualify as an "immediate relative." I conclude that it did not.

### 1) *Present Tense Language Employed by § 1154(b)*

The government contends that the present-tense language of another provision of the INA, 8 U.S.C. § 1154(b), implies that an alien widow or widower is not a "spouse" for the purposes of the first sentence of § 1151(b)(2)(A)(i). Section 1154(b) provides, *inter alia,* that, after a citizen spouse files an I–130 petition, US-CIS cannot approve the petition unless it determines (1) "that the facts stated in the petition *are* true"; and (2) that the alien "*is* an immediate relative" (emphasis added). According to the government, and as the Third Circuit found in *Robinson,* Congress' use of the present-tense words "are" and "is" in § 1154(b) "makes plain that the facts in the petition—including the alien's spousal status—must be true at the time USCIS decides the petition." *Robinson,* 554 F.3d at 363; *see also Burger v. McElroy,* No. 97 CIV. 8775, 1999 WL 203353, at *5 (S.D.N.Y.1999) (discussing BIA's interpretation of § 1154(b) "to require that the immediate family relation exist at the time the petition is adjudicated" and concluding that this was not "an impermissible construction of the statute").

While I agree with the *Robinson* court that § 1154(b) requires the facts set forth in the I–130 petition to be true at the time the petition is adjudicated, this conclusion does not affect my holding in light of my conclusion above that a surviving spouse remains a "spouse" for the purposes of § 1151(b)(2)(A)(i). Thus, because plaintiff is still a spouse, her eligibility to qualify as an immediate relative is unaffected by her husband's death. *See Taing,* 567 F.3d at 28 ("the use of the present tense in § 1154(b) does not affect our analysis because [plaintiff] still qualifies as 'an immediate relative' despite her husband's death"); *Lockhart,* 561 F.3d at 620.

### 2) *Automatic Revocation*

The government also relies on 8 U.S.C. § 1155 to support its reading of § 1151(b)(2)(A)(i). The statute now codified at § 1155, which was originally enacted in 1952,[11] permits the Secretary of Homeland Security, for "good and sufficient cause," to "revoke the approval of any petition approved by him under section 1154 of this title." 8 U.S.C. § 1155. The Executive Branch has long taken the position that the death of a citizen petitioner automatically revokes approval of an I–130 petition, an approach now codified at 8 C.F.R. § 205.1(a)(3)(i)(C)(2). The government argues that because Congress twice reenacted the statute presently codified at § 1155 without changing its relevant provisions,[12] Congress is deemed to have adopted the longstanding administrative interpretation of § 1155 that the death of a citizen petitioner results in automatic revocation of the approval of the petition. *See Boeing v. U.S.,* 537 U.S. 437, 456, 123 S.Ct. 1099, 155 L.Ed.2d 17 (2003) ("The fact that Congress did not legislatively override [a regulation] in enacting [an associated statute] serves as persuasive evidence that Congress regarded that regulation as a correct implementation of its intent."). Therefore, the argument goes, since the death of the citizen petitioner revokes the approval of an I–130 petition, it follows that the petitioner's death when the I–130 petition is pending warrants denial of the

---

**11.** *See* Immigration and Nationality Act of 1952 ("1952 Act"), Pub. L. 82–414, §§ 206, 407, 66 Stat. 163, 181, 281 (1952).

**12.** *See* Immigration and Nationality Act of 1965, Pub. L. 89–236, § 5, 79 Stat. 911, 915 (1965); Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. 108–458, § 5304(c) 118 Stat. 3638, 3736 (2004).

petition.[13]

■ This argument is flawed for at least two reasons. First, by its terms, Section 1155 applies only to approved petitions, whereas the I–130 petition at issue here was pending at the time it was denied. Like the courts in *Taing* and *Lockhart*, I am not convinced that it is appropriate to "extend a regulation that applies to the revocation of approved petitions to the pending petition context." *Taing*, 567 F.3d at 29 (citing *Lockhart*, 561 F.3d at 622). Second, in light of my conclusion that Congress did not intend the untimely death of a citizen petitioner to control an alien spouse's ability to qualify as an "immediate relative," the government's reading of § 1155's application to pending petitions is contrary to congressional intent. "Where a regulation conflicts with congressional intent as expressed in a statutory scheme, courts must give effect to congressional intent." *Id.* at 29; *see also Perales v. Thornburgh*, 967 F.2d 798, 809 (2d Cir.1992), *vacated on other grounds*, 509 U.S. 917, 113 S.Ct. 3027, 125 L.Ed.2d 716 (1993). Further, as the Sixth Circuit noted in *Lockhart*:

> Congress may have had a reasonable basis to permit the DHS to revoke approved petitions, but not permit the denial of pending petitions. Under the regulations, the DHS has discretion to refrain from automatically revoking an approved petition for humanitarian reasons. See 8 C.F.R. 205.1(a)(3)(i)(C)(2). There is no such relief available to alien spouses if the pending petition for adjustment of status is denied upon the death of their citizen spouses.

*Lockhart*, 561 F.3d at 621–22. Therefore, the government's reading of § 1155 denies

alien surviving spouses like plaintiff the opportunity to qualify for discretionary relief from automatic revocation of the approval of their I–130 petitions. The result is the creation of a "regulatory crevice" into which bona fide surviving spouses of United States citizens "will be dropped." *Robinson*, 554 F.3d at 370–71 (Nygaard, J., dissenting). I do not believe Congress intended to create any such regulatory crevice. Accordingly, for the reasons stated above, Section 1155 does not support the government's reading of § 1151(b)(2)(A)(i).

### 3) *Effect of BIA Precedent*

Finally, the government contends that I must defer to the BIA's decision in *Matter of Varela*, 13 I. & N. Dec. 453 (BIA 1970). In *Varela*, the BIA held that an alien ceases to be the "spouse" of a United States citizen when the citizen, petitioning on the alien's behalf, dies before the petition is adjudicated, and therefore that the alien cannot qualify as an "immediate relative." *Id.* at 453–54. As explained above, however, I conclude that the language of § 1151(b)(2)(A)(i) clearly and unambiguously indicates that Congress intended for surviving spouses like plaintiff to be eligible to qualify as "immediate relatives." Therefore, I need not accord defer to the BIA's decision in *Varela*. Further, I agree with and hereby adopt the First Circuit's reasoning on this issue in *Taing*:

> [W]e conclude that the language, text, structure, and context of the INA statutory scheme plainly and unambiguously indicate that Congress intended for surviving spouses such as [plaintiff to] qualify for "immediate relative" status for purposes of § 1151(b)(2)(A)(i); thus, we

---

**13.** The government concedes that this principle is, of course, subject to the exception for an alien beneficiary who was married to the citizen petitioner for at least two years at the time of the petitioner's death. 8 U.S.C. § 1151(b)(2)(A)(i). There is no dispute that this exception does not apply here.

need not accord *Chevron* deference to the BIA's decision in *Varela*. Even if we were to consider *Varela* under the less deferential standard articulated in *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944), it fails to persuade us for two main reasons. *See Lockhart*, 561 F.3d at 622 (holding that *Varela* is not entitled to either *Skidmore* or *Chevron* deference). First, the opinion summarily rules in favor of the government and does not engage in an adequate analysis of the statutory text. *See id.; Freeman*, 444 F.3d at 1038. Second, the BIA later found this decision to be extra-jurisdictional in *Matter of Sano*, 19 I. & N. Dec. 299 (BIA 1985), thereby making *Varela* a non-precedential decision. *See Lockhart*, 561 F.3d at 622; *Freeman*, 444 F.3d at 1038.

*Taing*, 567 F.3d at 30. Therefore, I need not defer to the BIA's decision in *Varela*.

Accordingly, for the reasons stated above and in light of the plain meaning of 8 U.S.C. § 1151(b)(2)(A)(i), plaintiff has shown that defendants, in denying her I–130 petition on the basis that she is no longer a "spouse" and thus ineligible for classification as an "immediate relative," took an action based on a conclusion that was "not in accordance with law," in violation of the APA. 5 U.S.C. § 706(2)(A).

## V. *Requested Relief*

 Plaintiff seeks declaratory relief pursuant to 28 U.S.C. § 2201(a), which is proper "(1) where the judgment will serve a useful purpose in clarifying and settling the legal relations in issue; or (2) when it will terminate and afford relief from the uncertainty, insecurity and controversy giving rise to the proceedings." *Maryland Cas. Co. v. Rosen*, 445 F.2d 1012, 1014 (2d Cir.1971) (citation omitted). Given my conclusion that Congress intended for plaintiff to be eligible to qualify as an "immediate relative" given that she is a "spouse" as that term is employed in the first sentence of § 1151(b)(2)(A)(i), and in light of USCIS's contrary determination and resultant denial of plaintiff's I–130 petition, I find that a declaratory judgment would alleviate the uncertainty over the legality of USCIS's actions and conclusions. Accordingly, as set forth in the Order accompanying this memorandum opinion, plaintiff's request for declaratory judgment is granted.

 Plaintiff also seeks mandamus relief pursuant to 28 U.S.C. § 1361, which provides that "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. "[M]andamus is an extraordinary remedy that is 'granted only in the exercise of sound discretion.'" *Miller v. French*, 530 U.S. 327, 340, 120 S.Ct. 2246, 147 L.Ed.2d 326 (2000) (citing *Whitehouse v. Illinois Central R. Co.*, 349 U.S. 366, 373, 75 S.Ct. 845, 99 L.Ed. 1155 (1955)). "The common-law writ of mandamus, as codified in 28 U.S.C. § 1361, is intended to provide a remedy for a plaintiff only if [s]he has exhausted all other avenues of relief and only if the defendant owes [her] a clear nondiscretionary duty." *Heckler v. Ringer*, 466 U.S. 602, 616, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984); *accord Anderson v. Bowen*, 881 F.2d 1, 5 (2d Cir.1989).

 Here, I am satisfied that plaintiff has exhausted all administrative avenues of relief available to her prior to bringing this action. In addition, while it is well settled that "matters solely within the discretion of the INS" are "not reviewable" under § 1361, *see Huli v. Way*, 393 F.Supp.2d 266, 270 (S.D.N.Y.2005) (citations omitted), the meaning of the terms

"immediate relative" and "spouse" as they appear in 8 U.S.C. § 1151(b)(2)(A)(i) are purely legal questions which do not implicate agency discretion. There is no dispute that defendants owe a "clear nondiscretionary duty" to plaintiff to adjudicate her I–130 petition and I–485 application in accordance with law. *See, e.g., Hoo Loo v. Ridge,* No. 04 CV 5553, 2007 WL 813000, at *3 (E.D.N.Y. Mar. 14, 2007) ("numerous courts have found that immigration authorities have a non-discretionary duty to adjudicate applications"). Because defendants' interpretation of "immediate relative" and "spouse" when they denied plaintiff's petition was not in accordance with law, mandamus relief directing defendants to adjudicate plaintiff's I–130 petition and I–485 in accordance with law is appropriate in the terms set forth in the accompanying Order.

 In addition, plaintiff seeks to enjoin the agency from determining that she is no longer a "spouse" such that she is ineligible for immediate relative classification under the INA, and from denying the I–130 petition and/or the I–485 application on that basis. "A party seeking preliminary injunctive relief must establish (1) either (a) a likelihood of success on the merits of its case as (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor, *and* (2) a likelihood of irreparable

harm if the requested relief is denied." *Time Warner Cable, Inc. v. DIRECTV, Inc.,* 497 F.3d 144, 153 (2d Cir.2007) (emphasis in original).[14] The standard for a permanent injunction is the same as that for a preliminary injunction except that the plaintiff must establish actual success, rather than merely a likelihood of success on the merits. *See, e.g., Lusk v. Vill. of Cold Spring,* 475 F.3d 480, 485 (2d Cir. 2007). Plaintiff has shown that defendants, in denying her I–130 petition, took an action based on a conclusion that was "not in accordance with law," in violation of the APA. 5 U.S.C. § 706(2)(A). She has therefore established actual success on the merits. In addition, defendants do not dispute that absent injunctive relief, plaintiff faces mandatory deportation, which qualifies as "irreparable injury." *Jayaraj v. Scappini,* 66 F.3d 36, 39 (2d Cir.1995) (irreparable harm is an "injury for which a monetary award cannot be adequate compensation"). Accordingly, plaintiff is entitled to injunctive relief in the terms set forth in the accompanying Order.

 Plaintiff further seeks to enjoin defendants from making certain allegations and charges and taking certain actions during her removal proceedings. However, 8 U.S.C. § 1252(g) bars courts from hearing claims arising from the placement of an alien in removal proceed-

---

**14.** In its reply submission, the government mistakenly argues that in *Munaf v. Geren,* the Supreme Court eliminated the "serious questions going to the merits" and "balance of hardships" prong of the well established test for a preliminary injunction, instead requiring a plaintiff in all cases to show a likelihood of success on the merits. —— U.S. ——, 128 S.Ct. 2207, 2219, 171 L.Ed.2d 1 (2008). This argument represents, at the very least, a serious misunderstanding of the Supreme Court's holding in *Munaf.* In that case, rather than doing away with the "serious questions" prong, the Court simply held that a preliminary injunction may not issue upon a finding that the *jurisdictional* issues in a case present serious questions giving rise to a fair ground for litigation. Rather, a court must consider the merits of the stated claims for relief before issuing a preliminary injunction. *See id.* ("[W]e hold that it was an abuse of discretion for the District Court to grant a preliminary injunction on the view that the 'jurisdictional issues' in Omar's case were tough, without even considering the merits of the underlying habeas petition.").

ings.[15] "While the statute creates an exception for 'constitutional claims or questions of law,' ... jurisdiction to review such claims is vested exclusively in the courts of appeals[.]" *Ajlani v. Chertoff*, 545 F.3d 229, 235 (2d Cir.2008). Accordingly, I am without jurisdiction to grant the requested relief.

Finally, plaintiff seeks a declaratory judgment that she has a right to an Employment Authorization Document ("EAD") and a mandamus order compelling USCIS to issue an EAD to her upon her application. She also seeks costs and reasonable attorney's fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq.* Neither of these issues have been briefed by the parties, and therefore, I lack a basis upon which to grant the requested relief. Accordingly, the requested relief is denied.

## CONCLUSION

For the reasons set forth above, plaintiff's requests for declaratory judgment, mandamus relief, and injunctive relief are granted in part and denied in part, and her request for costs and attorney's fees is denied without prejudice. The Clerk is hereby directed to transmit a copy of the within to the parties and to the assigned Magistrate Judge.

SO ORDERED.

---

**15.** 8 U.S.C. § 1252(g) provides, in relevant part, as follows: "[N]o court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter."